IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

**HUNTINGTON DIVISION**

SOUTHEASTERN CONSTRUCTION, INC.,
a Corporation, and SOUTHEASTERN
INTERNATIONAL, LLC, a Limited Liability Company,

Plaintiffs,

v.                                                                CIVIL  ACTION  NO.  3:05-210

TANKNOLOGY-NDE INTERNATIONAL, INC.,
a Corporation, ENVIRO-TECH INTERNATIONAL, YK,
a Yugen Kaisha, JAY ALLEN CHAFFEE,
THOMAS VON SCHIMONSKY, ERIC BLACK,
TATSUYOSHI MIYAZAKI, MASAKI NAKAGOME and
KENICHI YAMAZAKI,

Defendants.

**MEMORANDUM OPINION AND ORDER**

Pending is a motion to dismiss Defendants Enviro-Tech International, YK (hereinafter

"ETI"), Eric Black (hereinafter "Black"), Masaki Nakagome (hereinafter "Nakagome") and Kenichi

Yamazaki (hereinafter "Yamazaki") from the above-entitled action pursuant to Federal Rules of

Civil Procedure 12(b)(2) and (6) and the federal common law doctrine of *forum non conveniens*.

For the reasons set forth below, the motion is **DENIED**.

**I**

On March 11, 2005, Plaintiffs Southeastern Construction, Inc. (hereinafter "SEC") and

Southeastern International, LLC (hereinafter "SEI") filed a five count complaint against Defendants

Tanknology-NDE International, Inc. (hereinafter "Tanknology"), ETI, Jay Allen Chaffe (hereinafter

"Chaffe"), Thomas Von Schimonsky ("Schimonsky"), Black, Tatsuichi Miyazaki (hereinafter "Miyazaki"), Nakagome and Yamazaki.

The complaint alleges the following facts: Prior to March 14, 2002, SEC entered into negotiations with Tanknology to obtain the rights to use their technology to inspect underground storage tanks located in Japan. In connection with those negotiations, Tanknology's representatives Chaffe and Schimonsky falsely represented to SEC that it owned the aforesaid technology. By letter dated March 14, 2002, Chaffe, acting as Chairman of the Board of Tanknology, notified SEC that it had been appointed as its exclusive licensee to use its technology within Japan and that it agreed to deal only with SEC with respect to such activities within Japan. By Letter of Intent, dated March 14, 2002, Schimonsky, on behalf of Tanknology, entered into an agreement with SEC obligating it to provide its technology to a new company which would be formed by SEC.

In reliance upon SEC's agreement with Tanknology, the stockholders of SEC along with Black expended funds to formed SEI. The intended purpose of SEI was to establish a Japanese company, in accordance with Japanese law, owned by SEI that would engaged in the tank-testing business in Japan, utilizing Tanknology's technology. By agreement dated October 4, 2002, Tanknology granted to SEI the exclusive right to market and use its technology in Japan.

Based upon SEI's agreement with Tanknology, SEI entered into arrangements with Defendants Miyazaki, Nakagome, Yamazaki to establish the Japanese corporation ETI. By Letter of Intent, dated December 11, 2002, it was agreed between SEI, Miyazaki, Nakagome, Yamazaki and Black that ETI would be organized under Japanese law, that sixty percent of ETI's shares would belong to SEI and that the other forty percent would belong to Miyazaki, Nakagome and Yamazaki. Black, who was a member of SEI and an employee of SEC, was elected to be President of ETI. In

order to capitalize ETI and to provide sufficient funds to allow it to begin its operations, SEI - in reliance upon the aforementioned October 4, 2002 agreement and the representations of Miyazaki, Nakagome, Yamazaki and Black that ETI had been organized in accordance with the December 11, 2002 Letter of Intent between SEI and Miyazaki, Nakagome, and Yamazaki - transferred in excess of $800,000.00 to or on behalf of ETI.  This transfer of funds included payments to Tanknology that were required pursuant to the October 4, 2002 agreement.

As part of the scheme to defraud the plaintiffs, various documents -written in Japanese, represented to be copies of official corporate documents filed to establish ETI and prepared by Miyazaki, Nakagome and Black - were forwarded to SEI.  These corporate documents were transmitted by fax, mail and e-mail to the plaintiffs at their offices in West Virginia and falsely represented that ETI had been established as a Japanese corporation pursuant to Japanese law and that SEI owned sixty percent of ETI's stock.  The aforesaid corporate documents were false and had been fraudulently prepared by Black, Miyazaki and Nakagome for the purpose of concealing the fact that SEI had no interest in ETI which was owned by the defendants and thereby inducing the plaintiffs to invest in ETI.  Substantially all of the false information relied upon by the plaintiffs was transmitted to them in West Virginia and all decisions and transfer of funds occurred in West Virgnia.

Based upon testimony offered in connection with a bankruptcy proceeding involving Tanknology, SEI has learned that Tanknology-NDE Corp., not its licensor, Tanknology, owned the right of the aforementioned technology to inspect underground tanks.  SEI has further learned that Tanknology-NDE Corp. entered into an agreement with ETI directly which allowed ETI to used the technology at issue which Tanknology had represented had been licensed exclusively to SEI.

In the first count of the complaint, the plaintiffs claim that Tanknology breached its October 4, 2002 agreement with SEI by allowing its affiliate to license to ETI the tank-testing technology. In the second count, the plaintiffs claim that Defendants Tanknology, Chaffee and Schimonsky knew Tanknology did not own the exclusive rights to license the tank-testing technology, that this misrepresentation was material to the October 4, 2002 agreement, that this misrepresentation was made willfully, wantonly, recklessly and malicious and that because of the aforementioned misrepresentations plaintiffs have sustained compensatory damages in excess of $1,000,000.00 and are entitled to punitive damages. In the third count, the plaintiffs claim that Defendants Black, Miyazaki, Nakagome and Yamazaki purposely misled the plaintiffs into believing SEI owned sixty percent of ETI and have defrauded SEI out of $1,250,000.00. In the fourth count, the plaintiffs claim that Defendants Black, Miyazaki, Yamazaki misled the plaintiffs into believing SEI owned sixty percent of ETI and seek an order requiring the official records relating to the organization and capitalization of ETI be amended to conform to the agreement that SEI owns sixty percent of ETI. In the fifth count, the plaintiffs claim that Defendant ETI breached it promise to repay the Promissory Note dated October 21, 2003, and the plaintiffs demand judgment in the amount of $1,260,155.38.

On June 29, 2005, Defendants ETI, Black, Nakagome and Yamazaki moved to dismiss the complaint. As grounds for their motion, the defendants assert that this Court cannot maintain personal jurisdiction over them, that the choice of law and the forum-selection provision contained within the December 13, 2002 Agreement of Share Transfer should be honored and that, in accordance with the federal common law doctrine of *forum non conveniens*, the Tokyo courts are the proper forum for this lawsuit.

Attached to defendants' motion to dismiss and pursuant to 28 U.S.C. § 1746, Black declared the following facts to be true: In January of 2002, SEC, through its executive officer Jeff Collinsworth (hereinafter "Collinsworth"), met with Black to informally explore SEC's interest in the Japanese tank-testing business. This initial discussion led to Collinsworth and Black traveling to Japan to investigate that potential business venture. While in Japan, Collinsworth and Black met with Miyazaki and representatives of a Japanese oil company. Following the trip to Japan, Black accepted an offer from Collinsworth to join SEC.

On March 1-3, 2002, Collinsworth, Black, Miyazaki and Japanese oil company representatives met in Austin, Texas with Tanknology to witness an onsite demonstration of Tanknology's tank-testing technology. At the meeting, Collinsworth and Black discussed with Tanknology the possibility of SEC securing the right to license the tank-testing technology for use in Japan. Collinsworth also initiated conversations with Miyazaki and Nakagome regarding the possibility of establishing a business in Japan.

Subsequent to the above meeting, Tanknology and SEC entered into a Letter of Intent contemplating the appointment of SEC as Tanknology's exclusive licensee in Japan. Thereafter, SEI was formed in July of 2002 and entered into an exclusive license agreement with Tanknology in October of 2002. This exclusive licensing agreement appointed SEI as Tanknology's exclusive licensee in Japan, with the right to license and sub-license Tanknology's tank-testing technology.

After learning that Japanese law required a Japanese company to perform tank testing, Black and Collinsworth entered into discussions with Miyazaki about the formation of ETI. It was the parties' intention that ETI would be a Japanese company located in Japan, that ETI would operate under Japanese law, that SEI would sub-license to ETI the use of Tanknology's technology and that

ETI would service customers in Japan using Tanknology's equipment and technology.

On September 9, 2002, ETI was officially formed in Japan by Miyazaki.  Miyazaki solely invested the initial 3,000,000 Yen of capital into ETI.  Black relocated to Japan and assumed the role of ETI's president.  Thereafter, ETI began operations, utilizing Tanknology's equipment and technology.

SEI, through Collinsworth and its president Ed Martin (hereinafter "Martin"), traveled to Japan on about eight occasions between February of 2002 and December of 2003 in order to meet with the defendants as well as professional advisors and potential customers in connection with ETI and Japanese tank-testing business.

On December 11, 2002, a Letter of Intent regarding equity ratios in ETI was negotiated and executed.  On December 13, 2002, Miyazaki and SEI, through Martin, agreed that Miyazaki would transfer thirty-six shares to SEI, that SEI would pay Miyazaki 1,800,000 Yen as consideration for the shares, that the agreement is read based on Japanese law and that the action against this agreement is controlled exclusively under Tokyo courthouse.  The sale of the shares, however, was never consummated because SEI did not remit the 1,800,000 Yen in consideration for the shares.

In October of 2003, Black, at SEI's request, traveled to Huntington, West Virginia to discuss the status of the tank testing business in Japan and certain amounts allegedly owned by ETI to SEI. At this meeting, SEI required Black to sign a document styled as a "promissory note" in order to acknowledge the alleged existing indebtedness.  Black informed Martin that he did not want to sign the note until he checked the details of the note with ETI and SEI had proper documentation of the amount owed.  Martin, however, insisted that Black sign the note, and Black acquiesced.  The note was signed in Huntington, West Virginia.

In December of 2003, ETI was facing severe financial difficulties.  Black pleaded with SEI, through e-mail and telephone calls, for a capital injection to enable ETI's survival.  SEI never responded to ETI's request.

In order for ETI to continue to survive, Miyazaki, Yamazaki and Nakamigawa approved an increase of ETI's capital on January 9, 2004.  Miyazaki agreed to advance additional funds to ETI. Consequently, the capital base of ETI was restructured to reflect a breakdown of shares in the amount of 647 shares owned by Miyazaki, 10 shares owned by Yamazaki and 3 shares owned by Nakamigawa.

On July 22, 2005, the plaintiffs filed their response.  Attached to their response is an affidavit from Collinsworth.  The affidavit states that much of the pre-organizational planning for SEI's entry into the Japanese petroleum industry and the formation of ETI occurred in West Virginia at the offices of SEC.  Black was an active participant in the planning and was a Vice-President of SEC and a manager of SEI.  To effectuate the organization of ETI as a Japanese corporation, Black relocated to Japan as an officer of SEC and a representative of SEI and was paid a salary by SEC for his work.  Black provided information relating to ETI and its organizations to the affiant and Martin by e-mail, fax and telephone most of which was sent to the offices of SEC in Huntington, West Virginia.  SEI relied on Black's reports and information in providing funding for the organization and capitalization of ETI, and the source of funding was from accounts maintained in West Virginia which belonged to SEC or Collinsworth and in Kentucky from accounts belonging to Martin.

In addition to receiving information from Black by e-mail, fax and telephone, he also provided information relating to ETI's structure to SEI in West Virginia.  SEI also received

information from Miyazaki and had discussions with him while he was in West Virginia. Representatives of SEC made several trips to Japan in which they received assurances from Black and their Japanese associates that everything had been organized as agreed.

Finally, Martin and affiant understood that statements 3 and 4 in the December 13, 2002 Agreement of Share Transfer to mean "that to effectuate the transfer of ownership as provided in that agreement it would be necessary under Japanese law to prepare the required documents which needed to be recorded at the Tokyo courthouse to complete the transaction and evidence the ownership interest of SEI."  (Resp. Collinsworth Affidavit.)  In 2004, SEI learned that it had no interest in ETI.

On August 12, 2005, Defendants ETI, Black, Nakagome and Yamazaki filed their reply.  As the matter is now ripe for resolution, the Court will address each of the defendants' grounds for relief seriatim.

## II

Rule 12(b) provides, in pertinent part, as follows:

> Every defense, in law or fact, to a claim for relief in any pleading, whether a claim, counterclaim, cross-claim, or third party claim, shall be asserted in the responsive pleading thereto if one is required, except that the following defenses may at the option of the pleader be made by motion: . . . (2) lack of jurisdiction over the person, . . . (6) failure to state a claim upon which relief can be granted, . . . .  If, on a motion asserting the defense numbered (6) to dismiss for failure of the pleading to state a claim upon which relief can be granted, matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56, and all parties shall be given reasonable opportunity to present all material made pertinent to such a motion by Rule 56.

Fed. R. Civ. P. 12(b).  As the plaintiffs and the defendants have submitted evidence outside the pleadings, the Court finds that it must treat the pending motion as one for summary judgment under

Rule 56 of the Federal Rules of Civil Procedure.

Rule 56 provides, in pertinent part, as follows:

The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

Fed. R. Civ. P. 56(c) (2005).  Moreover, the rule also provides, in relevant part, as follows:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

Fed. R. Civ. P. 56(e) (2005).  In discussing this standard, the U.S. Supreme Court stated:

In our view, the plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.  In such a situation, there can be no "genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.  The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a sufficient showing on an essential element of her case with respect to which she has the burden of proof.

*Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986) (quoting Fed. R. Civ. P. 56(c)).

"[I]n assessing a motion for summary judgment all justifiable inferences must be drawn in favor of the nonmoving party for '[c]redibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts.'" *Drewitt v. Pratt*, 999 F.2d 774, 778 (4th Cir. 1993) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)).  Hence, "[t]he court 'must perform a dual inquiry into the genuineness and materiality of any purported factual issues.'"  999 F.2d at 778 (quoting *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 364 (4th Cir. 1985)).

The substantive law identifies facts that are material. Consequently, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgement. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson*, 477 U.S. at 248. "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." *Ross*, 759 F.2d at 364. Therefore, in reviewing the evidence, a judge must determine "whether a fair-minded jury could return a verdict for the plaintiff on the evidence presented. The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If no genuine issue of material fact exists, the Court has an obligation "to prevent 'factually unsupported claims and defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 323-24).

Finally, when a party's "state of mind" is a decisive element of a claim or defense, summary judgment is seldom appropriate because "state of mind" determinations usually depend on the credibility of witnesses or the resolution of conflicting inferences drawn from circumstantial or self-serving evidence. *Thacker v. Peak*, 800 F. Supp. 372, 376 (S.D.W.Va. 1992) (citing *Charbonnages de France v. Smith*, 597 F.2d 406, 414 (4th Cir. 1979) and *Ross*, 759 F.2d at 364)). Nevertheless, even if motive is material, summary judgment is not precluded if the claim rests solely on unsupported allegations. *Id.* (citing *Ross*, 759 F.2d at 365).

### III

### A

Starting with the personal jurisdiction grounds for relief, the defendants argue that this Court

cannot maintain personal jurisdiction over them pursuant to due process and traditional notions of fair play and substantial justice because of the following: (1) The defendants are residents of Japan and a Japanese corporation. (2) The only identified contacts by the defendants with West Virginia were contacts by fax, mail and e-mail and the transfer of funds. (3) The complaint is based upon a dispute concerning the transfer of ETI's shares, and ETI is a Japanese company located and doing business in Tokyo, Japan. (4) Defendants Yamazaki and Nakagome have never traveled to West Virginia in relation to their involvement in ETI. (5) None of the defendants have any employees, agents, sales, assets or presence in West Virginia. (6) The documents related to the alleged transfer of shares and alleged fraud and misrepresentation were all prepared and signed in Japan by the plaintiffs and ETI's representatives. The December 13, 2002 share transfer agreement calls for the application of Japanese law and the resolution of disputes by a Tokyo court. (7) Plaintiffs spent extended periods of time in Japan regarding its dealings with ETI. The burden on the defendants to defend this suit in West Virginia, on the other side of the world in a different language and under a different legal system, would be enormous. (8) West Virginia has little interest in resolving the ownership of a Japanese company. (9) This Court's Judgment may not be recognized or upheld under Japanese law. In support of their argument, the defendants point to the holdings in *Asahi Metal Ind. Co. v. Superior Court*, 480 U.S. 102, 114 (1987); *Scherk v. Alberto-Culver Company*, 417 U.S. 506 (1974); and *P.M. Enterprise v. Color Works, Inc.*, 946 F. Supp. 435, 438 (S.D.W.Va. 1996).

In response, the plaintiffs argue that the defendants through a series of misrepresentations and false statements - communicated to the plaintiffs who were in West Virginia - caused the plaintiffs to suffer a substantial loss when they capitalized ETI and paid license fees needed for its

operation, that such conduct is a tort, that the commission of a tort in West Virginia provides sufficient contact to allow the exercise of jurisdiction by this Court as outlined in *Jordan v. Shaw Industries*, 131 F.3d 134, 1997 WL 734029 (4th Cir. Nov. 26, 1997) (quoting *Brendle v. General Tire and Rubber Company*, 408 F.2d 116, 117 n.4 (4th Cir. 1969) ("When a person sustains loss by fraud, the place of the wrong is where the loss is sustained, not where fraudulent representations are made.")), that the defendants, regardless of their West Virginia contacts, are subject to the Court's jurisdiction under the conspiracy theory of jurisdiction set forth in *Cawley v. Block*, 544 F. Supp. 133 (D.Md. 1982) and that, in accordance with the holding in *Pittsburgh Terminal Corporation v. Mid Allegheny Corporation*, 831 F.2d 522 (4th Cir. 1987), Defendant Black, as an officer of SEC, is subject to this Court's jurisdiction.

This Court has previously stated the standard used to evaluate contested personal jurisdiction is:

> When a court's personal jurisdiction is contested by a Rule 12(b)(2) motion, the jurisdictional question raised is one for the court, and the plaintiff bears the burden of ultimately proving by a preponderance of the evidence the existence of a ground for jurisdiction. *Combs v. Bakker*, 886 F.2d 673, 676 (4th Cir. 1989). But where, as here, the court addresses the challenge only on the motion papers, supporting legal memoranda, affidavits, other documents, and the relevant allegations of the complaint, the burden on the plaintiff is to make a mere *prima facie* showing of jurisdiction to survive the jurisdictional challenge. *Id.*; *Ryobi America Corp. v. Peters*, 815 F. Supp. 172, 175 (D.S.C. 1993); *Verosol B.V. v. Hunter Douglas, Inc.*, 806 F. Supp. 582, 588 (E.D.Va. 1992).

> The burden plaintiff bears to establish the court's jurisdiction normally is not a heavy one, particularly where the court chooses to rule on the issue without an evidentiary hearing. 5A Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 1351 (1990). Mere allegations of personal jurisdiction are sufficient for a party to make a *prima facie* showing. *Dowless v. Warren-Rupp Houdailles, Inc.*, 800 F.2d 1305, 1307 (4th Cir. 1986). When considering a challenge to its personal jurisdiction on the parties'

> filings, the court must resolve factual conflicts in favor of the party asserting jurisdiction for the purpose of determining whether he or she has made the requisite *prima facie* showing.  *Bakker*, 886 F.2d 676; *Eastern Marketing Corp. v. Texas Meridian Prod. Co., Inc.*, 798 F. Supp. 363, 364 (S.D.W.Va. 1992) (Haden, C.J.).  The Court must "construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction."  *Bakker*, 886 F.2d at 676.

> *Clark v. Milam (Clark II)*, 830 F. Supp. 316, 318-319 (S.D.W.Va. 1993) (Haden, C.J.) (emphasis in original).  *See Clark v. Milam (Clark IV)*, 847 F. Supp. 409, 412 (S.D.W.Va. 1994) (Haden, C.J.); *Alpha Welding & Fabricating v. Todd Heller, Inc.*, 837 F. Supp. 172, 174 (S.D.W.Va. 1993) (Haden, C.J.).

*Bashaw v. Belz Hotel Management Co., Inc.*, 872 F. Supp. 323, 324 (S.D.W.Va. 1995).  When a defendant is from another country, however, the Court, in *Asahi Metal Industry Co., Ltd., v. Superior Court*, 480 U.S. 102, 114 (1987), provided the following cautionary instruction to the standard analysis: "The unique burdens placed upon one who must defend oneself in a foreign legal system should have significant weight in assessing the reasonableness of stretching the long arm of personal jurisdiction over national borders."

Rule 4(k)(1)(A) of the Federal Rules of Civil Procedure provides:

**(k) Territorial Limits of Effective Service.**
    **(1)** Service of a summons or filing a waiver of service is effective to establish jurisdiction over the person of a defendant
        **(A)** who could be subjected to the jurisdiction of a court of general jurisdiction in the state in which the district court is located, or

Fed. R. Civ. P. 4(k)(1)(A) (emphasis in original).  *See Carefirst of Maryland, Inc. v. Carefirst Pregnancy Centers, Inc.*, 334 F.3d 390, 396 (4th Cir. 2003) (holding that "[u]nder Federal Rule of Civil Procedure 4(k)(1)(A), a federal court may exercise personal jurisdiction over a defendant in the manner provided by state law").  *See also ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 622 (4th Cir. 1997).  Thus, this Court's personal jurisdiction over the defendants is subject to West

Virginia's long-arm statute.[1]

In *Abbott v. Owens-Corning Fiberglas Corp.*, 444 S.E.2d 285 (W.Va. 1994), the West Virginia Supreme Court held in syllabus point 5:

> A court must use a two-step approach when analyzing whether personal jurisdiction exists over a foreign corporation or other nonresident. The first step involves determining whether the defendant's actions satisfy our personal jurisdiction statutes set forth in *W.Va. Code*, 31-1-15 [1984] and W.Va. Code, 56-3-33 [1984]. The second step involves determining whether the defendant's contracts with the forum state satisfy federal due process.

However, in *In re Celotex Corp.*, 124 F.3d 619, 627-28 (4th Cir. 1997), the Fourth Circuit recognized that "[b]ecause the West Virginia long-arm statute is coextensive with the full reach of due process, it is unnecessary . . . to go through the normal two-step formula for determining the existence of personal jurisdiction. Rather, the statutory inquiry necessarily merges with the Constitutional inquiry." Accordingly, the only question before this Court concerning the issue at hand is whether the exercise of personal jurisdiction over the defendants would be consistent with the Due Process Clause.

---

[1]West Virginia's primary long-arm statute, W.Va. Code § 56-3-33(a), provides, in pertinent part, as follows:

> (1) Transacting any business in this state;
> . . .
> (3) Causing tortious injury by an act or omission in this state;

With regard to foreign corporations, W.Va. Code § 31-1-15 provides, in pertinent part, as follows:

> For the purposes of this section, a foreign corporation not authorised to conduct affairs or do or transact business in this state pursuant to the provisions of this article shall nevertheless be deemed to be conducting affairs or doing or transacting business herein . . . (b) if such corporation commits a tort, in whole or in part, in this state . . . .

A court's exercise of personal jurisdiction over a non-resident defendant is consistent with the Due Process Clause if the defendant has sufficient "minimum contacts" with the forum such that requiring the defendant to defend its interests in the forum does not "offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. Washington*, 326 U.S. 310, 316, 66 S. Ct. 154, 158, 90 L. Ed. 95 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463, 61 S. Ct. 339, 342, 85 L. Ed. 278 (1940)).  Later cases have clarified that the minimum contacts must be "purposeful."  *Burger King Corp. v. Rudzewicz*, 471 U.S. 462 474, 105 S. Ct. 2174, 2183, 85 L. Ed. 2d 528 (1985).  This "purposeful" requirement rests on the basic premise that traditional notions of fair play and substantial justice are offended by requiring a non-resident to defend itself in a forum when the non-resident never purposefully availed itself of the privilege of conducting activities within the forum thus never invoking the benefits and protections of its laws.  *See Hanson v. Denckla*, 357 U.S. 235, 253, 78 S. Ct. 1228, 1239, 2 L. Ed. 2d 1283 (1958); *Stover* [*v. O'Connell Assocs.*], 84 F.3d [132,] 136 [(4th Cir.), *cert. denied*, 519 U.S. 983, 117 S. Ct. 437, 136 L. Ed. 2d 334 (1996)].  Moreover, this "purposeful" requirement "helps ensure that non-residents have fair warning that a particular activity may subject them to litigation within the forum."  *Plant Genetic Systems, N.V. v. Ciba Seeds*, 933 F. Supp. 519, 523 (M.D.N.C. 1996) (citing *Burger King*, 471 U.S. 472, 105 S. Ct. at 2181 and *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297, 100 S. Ct. 559, 567, 62 L. Ed. 2d 490 (1980)).

*Celotex*, 124 F.3d at 628.

The standard for determining the existence of personal jurisdiction over a nonresident defendant varies, depending on whether the defendant's contacts with the forum state also provide the basis for the suit.  If those contacts form the basis for the suit, they may establish "specific jurisdiction."  In determining whether specific jurisdiction exists, we consider (1) the extent to which the defendant has purposefully availed itself of the privilege of conducting activities in the state; (2) whether the plaintiffs' claims arise out of those activities directed at the state; and (3) whether the exercise of personal jurisdiction would be constitutionally "reasonable."  *ALS Scan, Inc. v. Digital Serv. Consultants, Inc.*, 293 F.3d 707 711-12 (4th Cir. 2002), *cert. denied*, 537 U.S. 1105, 123 S. Ct. 868, 154 L. Ed. 2d 773 (2003); *see Helicopteros Nacionales de Columbia, S.A. v. Hall*, 466 U.S. 408, 414 & n. 8, 104 S. Ct. 1868, 80 L. Ed. 2d 404 (1984).

*Carefirst*, 334 F.3d at 397.

In *Cawley v. Block*, 544 F. Supp. 133 (D. Md. 1982), the court provided the following

analysis regarding personal jurisdiction based upon a conspiracy theory:

That doctrine is based on two principles: (1) that the acts of one co-conspirator are

Page 15 of  30

attributable to all co-conspirators, *McLaughlin v. Copeland*, 435 F. Supp. 513, 530 (D. Md. 1977) ("*McLaughlin*"); and (2) that the constitutional requirement of minimum contacts between non-resident defendants and the forum can be met if there is a substantial connection between the forum and a conspiracy entered into by such defendants. *Vermont Castings, Inc. v. Evans Products Co.*, 510 F. Supp. 940, 944 (D. Vt. 1981). The conspiracy theory of jurisdiction as developed in the cases, holds that when several individuals (1) conspire to do something (2) that they could reasonably expect to have consequences in a particular forum, if one co-conspirator (3) who is subject to personal jurisdiction in the forum (4) commits overt acts in furtherance of the conspiracy,[2] those acts are attributable to the other co-conspirators, who thus become subject to personal jurisdiction even if they have no other contacts with the forum. *See Vermont Castings*, *supra*, 510 F. Supp. at 944; *National Egg Co. v. Bank Leumi le-Israel B. M.*, 504 F. Supp. 305, 313 (D. Ga. 1980); *Gemini Enterprises, Inc. v. WFMY Television Corp.*, 470 F. Supp. 559, 564 (D.N.C. 1979); *McLaughlin* at 529-30; *Leasco Data Processing Equipment Corp. v. Maxwell*, 319 F. Supp. 1256, 1261-62 (S.D.N.Y. 1970), *aff'd*, 468 F.2d 1326, 1343 (2d Cir. 1972).

There is some ambiguity surrounding the interaction between the third and fourth elements. Where, as here, the co-conspirator who commits the overt acts is not a resident of the forum, the overt acts must be sufficient to establish jurisdiction over that co-conspirator under the state's long-arm statute. *See, e.g.*, *National Egg*, *supra*, 435 F. Supp. At 529-30. The reasoning behind this position is that only if the overt acts are sufficient to establish long-arm jurisdiction over the conspirator who committed the acts would it be fair to subject to personal jurisdiction the other co-conspirators who are merely "deemed" to have committed the overt acts.

However, in several cases in which the conspirator who committed the overt acts was a resident of the forum, courts have required only that "substantial acts" in furtherance of the conspiracy be committed in the forum.[3] *See Vermont Castings*, *supra*, 510 F. Supp. At 944; *Gemini Enterprises*, *supra*, 470 F. Supp. at 564. While

---

[2]The overt acts need not be committed in the forum. In *McLaughlin*, there were three non-resident co-conspirators, one of whom mailed letters into Maryland. The court found that there was personal jurisdiction over that defendant under the Maryland long-arm section providing for jurisdiction over individuals who cause tortious injury in or outside the state by an act outside the state if he engages in a persistent course of conduct in the state. *Id.* at 529-30. The court went on to hold that under the conspiracy theory, the acts of the one co-conspirator were attributable to the other non-resident conspirators, who thus became subject to personal jurisdiction under the same long-arm section. *Id.*

[3]Of course, the second element, requiring that the conspirators could reasonably have expected their actions to have effects in the forum, must also be met. *See Vermont Castings*, *supra*, 510 F. Supp. at 564.

these courts did not address the point explicitly, the only reasonable interpretation of this standard is that the acts committed in furtherance of the conspiracy must be of a type that, if committed by the non-resident co-conspirators themselves, they would have provided a basis for subjecting the non-residents to personal jurisdiction under the forum's long-arm statute. If the overt acts do not meet this standard, it would be patently unfair to subject those non-residents to personal jurisdiction via the conspiracy theory, under which the non-residents' contacts with the forum are less direct.

All this suggests a need for a simplified articulation of the conspiracy theory of jurisdiction. Under that doctrine, when

(1) two or more individuals conspire to do something
(2) that they could reasonably expect to lead to consequences in a particular forum, if
(3) one co-conspirator commits overt acts in furtherance of the conspiracy, and
(4) those acts are of a type which, if committed by a non-resident, would subject the non-resident to personal jurisdiction under the long-arm statute of the forum state,

then those overt acts are attributable to the other co-conspirators, who thus become subject to personal jurisdiction in the forum, even if they have no direct contacts with the forum.

*Cawley*, 544 F. Supp. at 134-35 (footnotes in original).

In *EPlus Technology, Inc. v. Aboud*, 313 F.3d 166 (4th Cir. 2002), the defendant had organized several credit scams to defraud computer equipment suppliers. To recover its losses resulting from one of these scams, the plaintiff filed a civil action in the Eastern District of Virginia, asserting that the defendant had violated state tort law and the Racketeer Influence and Corruption Act, 18 U.S.C. §§ 1961-1968. Following a bench trial, the district court found the defendant liable on both claims and awarded the plaintiff $891,423.00. On appeal, the defendant raised several challenges to the court's judgment, including that the court lacked jurisdiction over her. In denying the defendant's personal jurisdiction challenge, the court stated:

In order to obtain credit for MBT from Virginia corporations, [the defendant]

submitted false information to Dun & Bradstreet, and she faxed credit applications to ePlus and Intelligent Decisions, Inc. in Virginia.  Because ePlus's claims involve credit fraud, these acts alone are sufficient to justify the court's exercise of jurisdiction over [the defendant].  . . . .

Furthermore, the exercise of jurisdiction over [the defendant] does nothing to "offend traditional notions of fair play and substantial justice."  *Int'l Shoe Co.*, 326 U.S. at 316, 66 S. Ct. 154.  Put simply, there is nothing unreasonable about subjecting her to jurisdiction in Virginia.  [The defendant] could reasonably have assumed, based on her contacts with the Commonwealth, that she would be sued there.  She had submitted false information to Dun & Bradstreet in connection with its Reports on MBT, intending for Virginia businesses to rely on this information.  Considering these facts, [the defendant] knew or should have known that she could be sued in Virginia.  We therefore see the court's exercise of jurisdiction over [the defendant] as eminently reasonable and consistent with due process.[4]

313 F.3d at 177 (footnote in original).

In *First Chicago Int'l v. United Exchange Co., Ltd.*, 836 F.2d 1375 (D.C. Cir. 1988), the

plaintiff, a bank, claimed that the district court had jurisdiction over the first foreign defendant

through the agency of a second foreign defendant and a domestic defendant.  The plaintiff alleged

that the three defendants had engaged in a check kiting conspiracy to the plaintiff's detriment.  The

court upheld the decision of the district court stating that "[t]here is no concrete evidence in the

record indicating that there was a common plan . . ."  *Id.* at 1378.  The court reasoned that such a

plaintiff must allege specific facts connecting the defendant with the forum and that "the bare

allegations of conspiracy or agency is insufficient to establish personal jurisdiction."  *Id.* at 1378-79

---

[4]The fact that [the defendant] is a Canadian citizen does not deprive the district court of jurisdiction.  While the Supreme Court, in *Asahi Metal Industry Co. v. Superior Court*, 480 U.S. 102, 113, 107 S. Ct. 1026, 94 L. Ed. 2d 92 (1987), cautioned federal courts against reaching out to exercise jurisdiction over foreign entities, our national interest in foreign affairs does not outweigh ePlus's interest in obtaining relief from [the defendant], or Virginia's interest in adjudicating ePlus's claims. [The defendant] intended to defraud Virginia corporations of substantial amounts of valuable property, and she cannot rely on the border between Canada and the United States as a shield for her illegal activities.

(citing *McLaughlin*, 707 F.2d at 806).

    *See also English & Smith v. Metzger*, 901 F.2d 36, 38 (4th Cir. 1990) (stating that "a single act by a nonresident which amounts to transacting business in Virginia and gives rise to a cause of action may be sufficient to confer jurisdiction upon [Virginia] courts.") and *ESAB Group, Inc. v. Centricut, Inc.*, 126 F.3d 617, 625 (4th Cir. 1997) (stating that "contacts relate to the cause of action must create a 'substantial connection' to the forum state.") (quoting *McGee v. Int'l Life Ins. Co.*, 355 U.S. 220, 223 (1957)). *But see Saudi v. Northrop Grumman Corp.*, 427 F.3d 271, 276 (4th Cir. 2005) (finding that the district court did not have specific personal jurisdiction over the defendant because plaintiff's claims did not arise out the limited contacts in New Jersey and therefore did not provide a basis for the suit); *CEM Corp. v. Personal Chemistry*, AB, 55 Fed. Appx. 621, 625 2003 WL 122510 (4th Cir. Jan. 15, 2003) (*per curiam*, unpublished) (holding that "[o]ne visit to the state, accompanied by a few telephone calls and faxes to settle litigation initiated against it in Sweden, would not put [the defendant] on notice that it 'should reasonably anticipate being haled into court' in North Carolina."); *Diamond Healthcare of Ohio, Inc. v. Humility of Mary Health Partners*, 229 F.3d 448, 451-52 (4th Cir. 2000) (refusing to extend personal jurisdiction in Virginia over foreign defendant, even though defendant contracted with Virginia corporation after telephone calls, letters and faxes to Virginia, because "bulk of services" not performed in Virginia); *Ellicott Mach. Corp. v. John Holland Party Ltd.*, 995 F.2d 474, 478-79 (4th Cir. 1993) (finding contacts with Maryland "insubstantial," although contract made in Maryland, after purposeful initiation by the foreign defendant and several weeks of negotiations involving letters, faxes, and telephone calls to Maryland).

    It appears from the holding in *Asahi* that there is a heightened standard when assessing

whether a court has *in personam* jurisdiction over an individual from a foreign country. Moreover, in accordance with the holdings in *Cawley*, *Abound* and *First Chicago Int'l*, the standard for *in personam* jurisdiction under the doctrine of conspiracy theory requires that the claim arise from the contacts of one of the conspirators with the forum state in order to confer jurisdiction on the other conspirators (*i.e.*, a specific *in personam* jurisdiction analysis), that bare allegations of conspiracy are insufficient to establish jurisdiction and that a plaintiff must allege specific facts connecting the defendant with the forum state in order to establish jurisdiction.

In the case *sub judice*, Collinsworth stated in his affidavit that Black was an officer of SEC and was sent to Japan to effectuate the organization of ETI, that Black provided information concerning ETI to Martin and him by e-mail, fax and telephone at SEC's office in Huntington, West Virginia, that Martin and he relied upon Black's reports in providing funding to capitalize ETI, that the source of that funding came from accounts in West Virginia and Kentucky, that Black also provided information concerning ETI to them, in person, in West Virginia, that Miyazaki also provided information concerning ETI to them, in person, in West Virginia as well as by fax from Japan to West Virginia, that Martin, John Barker and he made several trips to Japan and received assurances from Black and their Japanese associates that ETI had been organized as agreed, that, in 2004, SEI learned that it had no interest in ETI.

In Black's declaration, he states that he was hired by SEC, that he was aware that SEI had an exclusive licensing agreement with Tanknology regarding use of Tanknology's tank-testing technology in Japan, that ETI began operations in September of 2002 using Tanknology's equipment and technology, that he signed a promissory note on behalf of ETI acknowledging ETI indebtedness to SEI, that SEI owns no interest in ETI and that he pleaded with SEI, through e-mail and telephone

calls, for a capital injection for ETI in December of 2003.

Taking the evidence in the light most favorable to the plaintiffs as well as drawing the most favorable inferences from that evidence, it appears the defendants, mostly through Black, engaged in a persistent course of conduct of providing false information concerning the ownership of ETI from at least December 11, 2002 to January of 2004; that the false information was communicated, among other places and times, to the plaintiffs by two personal visits by Black and Miyazaki in West Virginia as well as numerous e-mails, mailings and telephone calls from Japan to West Virginia; that, in reliance upon the false information, SEI forwarded funding to ETI or on its behalf, that ETI knew SEI owned the licensing rights regarding Tanknology's technology for use in Japan; that, by Black's admission, ETI began operation in 2002 using Tanknology's equipment and technology; that, by Black's admission, ETI received funding from SEI; and that SEI has no ownership interest in ETI.  Based on the aforementioned evidence, the Court holds that the plaintiffs have made out a *prima facie* showing under the conspiracy theory of *in personam* jurisdiction.  Accordingly, the motion for relief based upon the ground of a lack of *in personam* jurisdiction over the defendants is denied

## B

Next, the defendants argue that the December 13, 2002 Share Transfer Agreement includes a forum selection clause requiring that this action be filed in a Tokyo court.  The clause at issue is the following: "The action against this agreement is controlled exclusively under Tokyo courthouse." (Mot. Dismiss Ex. B.)  The defendants further argue that the agreement was drafted by a Tokyo firm and in accordance with Japanese law, that the plaintiffs were present when the agreement was signed by the interested parties and had ample opportunity to object to any of the

provision of the agreement, that the plaintiffs failed to remit the payment of 1,800,000 Japanese Yen,

that payment of the 1,800,000 Yen was a prerequisite to effectuating the transfer of the 36 shares

of ETI to the plaintiffs and that the filing of this law suit in West Virginia is a blatant attempt to

harass the defendants because the proper forum to resolve this dispute is in Tokyo.  In support of

their argument, the defendants point to *Mylan Pharmaceuticals, Inc. v. American Safety Razor

Company*, 265 F. Supp. 2d 635, 639 (N.D.W.Va. 2002) (stating: "Forum selection clauses are

presumptively enforceable absent a strong showing that the clause should be set aside or not

enforced because the circumstances would render it unreasonable.") and *TMC Co., Ltd. v. M/V

Mosel Bridge*, 2002 WL 1880722 (S.D.N.Y. Aug. 15, 2002) (Kaplan, J.) (unpublished) (holding that

the clause "any action thereunder shall be brought before the Tokyo District Court in Japan" means

exactly what it says and that it does not mean "'may be brought before the Tokyo District Court in

Japan' as well as anywhere else plaintiff might care to sue").

The defendants also argue that the plaintiffs are attempting to sidestep the forum selection

clause by crafting their claims in tort instead of contract law.  In support of this argument, the

defendants point to *Lambert v. Kysar*, 983 F.2d 1110, 1121 (1st Cir. 1993) (holding: "We cannot

accept the invitation to reward attempts to evade enforcement of forum selection agreement through

'artful pleading of tort claims' in the context of a contract dispute."); *Terra Int'l, Inc. V. Mississippi

Chemical Corp.*, 119 F.3d 688 (8th Cir. 1997) (stating that product liability claims held to fall under

forum-selection clause in parties' licensing agreement); and  *Forrest v. Verizon*, 805 A.2d 1007,

1015 (D.C. 2002) (stating that if "commonality of facts" between tort and contract claims, forum-

selection clause should apply; "to rule otherwise would be to 'evade the . . . forum-selection clause

[and] yield the untenable result that related and indeed parallel claims would be litigated in different

forums'").

In response, the plaintiffs argue that the complaint does not request enforcement of the agreement, that the agreement is only evidence of the existence of the fraud, that it was their understanding that the clause meant that in order to effectuate the transfer of ownership the agreement had to be recorded in the Tokyo courthouse and that it is the defendants' burden to prove that the clause at issue is a forum selection clause and that it is valid under that system of jurisprudence.  In support of their argument, the plaintiffs point to *Riffe v. Magushi*, 859 F. Supp. 220 (S.D.W.Va. 1994).

In reply to plaintiff's argument that the defendants have the burden of proving that the forum selection clause at issue is a forum selection clause and that it is valid under Japanese jurisprudence, the defendants point to Article 11 of The Code of Civil Procedure of Japan.  Article 11 provides:

> (Agreement of jurisdiction)
> Article 11. The parties may determine the competent court by agreement as far as the first instance is concerned.
> 2. The agreement mentioned in the preceding paragraph shall not be effective unless it is related to a suit on the basis of a certain legal relation and it is made in writing.

(Reply Ex. C.)

> Where foreign law is applicable, the parties have the burden of sufficiently proving foreign law in such a way that the court may apply it to the facts of the case.  *The Fort Games*, 18 F.2d 413, 414 (D. Md. 1927) ("'There is no presumption that the law of foreign countries is unlike ours.  One who would rely upon the difference . . . must prove its existence.  If he does not, we apply our own law to the case.'"  *Citing The Hoxie*, 297 F. 189 (C.C.A. 4), *cert. denied*, *American Exp Co, Aktieselskab v. U.S.*, 266 U.S. 608, 45 S. Ct. 91, 69 L. Ed. 465 (1924)).  *See also Pfizer Inc. v. Elan Pharmaceutical Research Corp.*, 812 F. Supp. 1352, 1361 (D. Del. 1993), *citing Cunningham v. Quaker Oats Co.*, 107 F.R.D. 66, 77 (W.D.N.Y. 1985).  The Court is under no obligation to undertake research of foreign law, although it may resort to any helpful source.  *Carey v. Bahama Cruise Lines*, 864 F.2d 201, 205 (1st Cir. 1988); *Pfizer Inc. v. Elan Pharmaceutical Research Corp.*, *supra*, 812 F. Supp. at 1361; *Fabrica De Tejidos La Bellota S.A. v. M/V MAR*, 799

F. Supp. 546, 561 (D.V. I. 1992).  Where foreign law is not sufficiently established, the court will apply the law of the forum state.  *Banco de Credito Industrial v. Tesoreria General de la Seguridad Social de Espana*, 990 F.2d 827, 836 (5th Cir. 1993), *cert. denied*, 510 U.S.1071, 114 S. Ct. 877, 127 L. Ed. 2d 73 (1994) ("When the parties have failed to establish foreign law, a court is entitled to look to its own forum's law in order to fill in any gaps."  *Citing Cantieri Navali Riuniti v. M/V SKYPTRON*, 802 F.2d 160 (5th Cir. 1986)).  As was stated in *Phizer Inc. v. Elan Pharmaceutical Research Corp.*, *supra*, 812 F. Supp. at 1360-61:

> "The Court is free to disregard [expert affidavits] under Rule 44.1. *See, e.g.*, *Chantier Naval Voisin v. M/Y Daybreak*, 677 F. Supp. 1563, 1567 (S.D.Fla. 1988) (court not bound by evidence submitted by party's expert on foreign law).
>
> *See also Banque Libanaise Pour Le Commerce v. Khreich*, 915 F.2d 1000, 1006-07 (5th Cir. 1990) (party obligation to present to the district court proof of relevant foreign law).  . . .  Under Rule 44.1, a court is not required to engage in its own research and has the right to insist that the proponent of the foreign law present evidence on the question.  *See Cunningham v. Quaker Oats Co.*, 107 F.R.D. 66, 77 (W.D.N.Y. 1985).  According to commentators, '[i]n many instances the [court] will not utilize the prerogatives found in the second sentence of Rule 44.1 [stated above].' 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2444, at 408 (1971).  Nothing in Rule 44.1 requires a court to engage in private research; the rule preserves the court's right to insist upon a complete presentation by counsel on the foreign law issue."

*Citing Commerical Ins. Co. of Newark, N.J. v. Pacific-Peru Const. Corp.*, 558 F.2d 948, 952 (9th Cir. 1977).  *See generally*, 9 Charles A. Wright & Arthur R. Miller, *Federal Practice and Procedure* § 2447 (1971 & Supp. 1994).  The court may insist upon a complete presentation of foreign law, one that sufficiently establishes the relevant foreign law to be applied.

*Riffe*, 859 F. Supp. at 223-24.

In the case *sub judice*, the defendants contend that the clause at issue here is a forum selection clause that requires any dispute concerning the agreement be filed with a Tokyo court. The plaintiffs, on the other hand, contend that the agreement is only evidence of the fraud, that they are not requesting enforcement of the agreement and that the clause directs the agreement to

be recorded at the Tokyo courthouse.

Contrary to the defendants' contention, the fourth count of the complaint in essence seeks enforcement of the agreement as memorialized in the December 11, 2002 Letter of Intent, not the December 13, 2002 Agreement of Share Transfer.  Moreover, putting the December 13, 2002 Agreement of Share Transfer into context with the rest of the facts in this case, it appears that the document is simply a vehicle to implement the agreement made on December 11, 2002.  Thus, the clause at issue here from the December 13, 2002 Agreement of Share Transfer is a red herring because the real meeting of the minds took place on December 11, 2002 and that agreement as memorialized in the letter of intent does not include a forum selection clause. Furthermore, while Japanese law allows for the enforcement of forum selection clauses in agreements that are in writing, the meaning of the clause at issue here is unclear.  The plaintiffs have submitted an affidavit stating that Collinsworth's understanding of the clause was that the agreement was to be recorded at the Tokyo courthouse.  The defendants - having the burden of persuasion - have submitted a declaration from Black stating that the clause directs that the Tokyo District Court is to have exclusive jurisdiction over any action related to the agreement. Taking the evidence in the light most favorable to the plaintiffs as well as drawing the most favorable inferences from that evidence, the Court holds that the defendants have failed to satisfy their burden.  Accordingly, the motion to dismiss on the forum selection clause ground is denied.

## C

Next, the defendants assert that they are entitled to relief under the federal common law doctrine of *forum non conveniens*.  Specifically, the defendants argue that "this case relates almost entirely to defendants in Japan, actions which took place in Japan, agreements prepared,

negotiated and entered into in Japan, and issues pertaining to the formation and capital of a Japanese company," that "[t]he witnesses are in Japan, beyond the reach of compulsory process, and the cost of bring even willing witnesses to West Virginia would be prohibitive," that "[i]t will be costly and time consuming to arrange for the testimony of exert [sic] witnesses on Japanese law," that "it would be impossible for this court to enforce any Order, whether for damages or injunctive relief, when the defendant and all of their assets and property are in Japan and all corporate documents are filed with and/or under the control of Japanese governmental bodies," that "[t]his case will inevitably require the Court to apply, and make rulings, utilizing Japanese law," that "[t]he application of Japanese law is necessary due to the choice of Japanese forum and law in the Share Transfer Agreement, and the fact that no other State or country has a more significant relationship with the parties to this action," that "Japan has a natural and strong interest in determining the shareholdings of companies within its borders and formed under its laws," that the Court could conditionally dismiss this action upon the plaintiffs' ability to achieve jurisdiction and service of process over the defendants in Japan and that "proceeding with this case in West Virginia would be more than inconvenient and grossly burdensome on the Japanese defendants and potential witnesses, and therefore, would be wasteful of this Court's resources, as well as the potential juror's time, who would be called to decide upon a case that possesses no bearing upon Federal or West Virginia public policy and law."  (Mot. Dismiss Mem. Law at 17-19.)

In response, the plaintiffs argue that the evidence in this case is mostly documents, that the defendants are the witnesses, that it is unlikely the Japanese court will be able to assert jurisdiction over the defendants from Texas, that under the defendants' approach it would be

necessary to have two trials in which many of the witnesses and much of the document evidence would be the same, that West Virginia has an interest in protecting its citizens from fraud, that the Japanese court will need expert evidence in order to resolve the fraud count and that "having committed fraud in West Virginia, the Japanese Defendants should not be surprised if they have to defend themselves here."  (Resp. at 13.)

In *Piper Aircraft Co. v. Reyno*, 454 U.S. 235 (1981), the Court, relying on its prior holdings in *Gulf Oil Corp. v. Gilbert*, 330 U.S. 501 (1947) and *Koster v. Lumbermens Mut. Cas. Co.*, 330 U.S. 518 (1947), stated

> that a plaintiff's choice of forum should rarely be disturbed.  However, when an alternative forum has jurisdiction to hear the case, and when trial in the chosen forum would "establish . . . oppressiveness and vexation to a defendant . . . out of all proportion to plaintiff's convenience," or when the "chosen forum [is] inappropriate because of considerations affecting the court's own administrative and legal problems," the court may, in the exercise of its sound discretion, dismiss the case.  *Koster*, *supra*, at 524, 67 S. Ct., at 831-832.  To guide trial court discretion, the Court provided a list of "private interest factors" affecting the convenience of the litigants, and a list of "public interest factors" affecting the convenience of the forum.  *Gilbert*, *supra*, 330 U.S. at 508-509, 67 S. Ct., at 843.

*Reyno*, 454 U.S. at 241.  In other words, in resolving a motion to dismiss pursuant to the *forum non conveniens* doctrine, the Court must first determine whether the defendants have shown that an alternative forum is available to the plaintiffs because the doctrine presupposes that at least two forums in which the defendants are amenable to process.  *See Gulf Oil*, 330 U.S. at 507.  Secondly, if an alternative forum exists which has jurisdiction over the matter, the defendants then must demonstrate, through analysis of the private and public interest factors, that trial of the action would be more appropriate in the alternative forum.

In a footnote, the Court identified the following private and public interest factors to be weighed:

The factors pertaining to the private interests of the litigants included the "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; possibility of view of premises, if view would be appropriate to the action; and all other practical problems that make trial of a case easy, expeditious and inexpensive." *Gilbert*, 330 U.S., at 508, 67 S. Ct., at 843.

The public factors bearing on the question included the administrative difficulties flowing from court congestion; the "local interest in having localized controversies decided at home"; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflicts of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty. *Id.*, at 509, 67 S. Ct., at 843.

454 U.S. at 241 n.6.

In the case *sub judice*, the Court is hard pressed to find that a Japanese court would be able to exercise jurisdiction over the defendants from Texas.  The defendants from Japan do not address this threshold issue in their arguments.  Instead, they focus their argument on all of rights available to the plaintiffs without addressing the basis upon which a Japanese court would exercise jurisdiction over the defendants from Texas.  Thus, dismissal pursuant to the *forum non conveniens* doctrine is inappropriate because the Japanese forum is not an alternative forum for this action.

Moreover, the complaint alleges that the defendants from Japan and Texas conspired together to cut SEI - the so called "middleman" in the business deal at issue in this case - out of the business deal after it had expended funds to acquire the rights to Tanknology's technology and to capitalize ETI.  Thus, it would be unfair to plaintiffs to require them to press their claims in two different courts and to run the risk of inconsistent judgments as well as to absorb the financial costs and loss of time of two different trials.

With regard to proof, the defendants do not appear to disagree with the plaintiffs'

Page 28 of  30

contentions that this case is a document case and that the witnesses are the parties themselves.  It is clear that discovery for both parties will be costly and will involve frequent shuttling of documents and attorneys, between Japan and the United States.  Thus, this factor favors neither forum.  With regard to the burden of travel, this factor favors neither forum because who ever is required to travel will bear the hardship.  With regard to a forum's interest, again this factor favors neither party because while Japan has a substantial interest in determining the ownership of corporations within its border, West Virginia equally has a substantial interest in protecting its citizens from fraud.  Finally, the defendants have pointed out some conflicts of law problems, however, these problems do not appear to be particularly difficult.

As the defendants have failed to make their threshold showing that the Japanese forum is an alternative forum for this action, and as the private and public interest factors do not substantial weigh in favor of either forum, the Court holds that the defendants have failed to satisfy their burden that they are entitled to dismissal pursuant to the federal common law doctrine of *forum non conveniens*.

## IV

Based on the foregoing, it is hereby **ORDERED** that defendants' motion to dismiss be, and is, **DENIED**.

The Clerk is directed to mail a copy of this Memorandum Opinion and Order to all counsel of record.

ENTER: December 22, 2005

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE